UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK    02190

| | |
|---|---|
| **NAOMI RAPHAEL, Individually and On Behalf of All Others Similarly Situated,**<br><br>        **Plaintiff,**<br><br>     **v.**<br><br>**MUNICIPAL MORTGAGE & EQUITY, LLC, MARK J. JOSEPH, MICHAEL L. FALCONE, WILLIAM S. HARRISON, MELANIE M. LUNDQUIST, DAVID B. KAY, CHARLES C. BAUM, EDDIE C. BROWN, ROBERT S. HILLMAN, ARTHUR S. MEHLMAN, and FRED N. PRATT, JR.,**<br><br>        **Defendants.** | **Civil Action No.**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED**<br><br> |

Plaintiff alleges the following upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief based upon the investigation of plaintiff's attorneys as to all other matters. The investigation included the review and analysis of publicly filed documents of Municipal Mortgage & Equity, LLC ("MuniMae" or the "Company") with the United States Securities and Exchange Commission ("SEC"), press releases, news articles and the review and analysis of accounting rules and related literature.

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of all investors who purchased MuniMae common stock between May 3, 2004 through January 28, 2008, inclusive (the "Class Period").

2.      This action is a securities fraud action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC by plaintiff on behalf of all those who purchased MuniMae common

stock during the Class Period, to recover damages caused to the Class by defendants' violations
of the securities laws.

3.      During the Class Period, defendants issued materially false and misleading state-
ments regarding MuniMae's business and financial results. As a result of defendants' false state-
ments, MuniMae shares traded at artificially inflated prices during the Class Period, reaching its
Class Period high of $32.20 on December 29, 2006.

4.      Specifically, during the Class Period, defendants issued numerous false and mis-
leading statements concerning, among other things, MuniMae's numerous financial interests in
certain entities; the value and performance of its tax-exempt bond portfolio; and the adequacy of
its internal controls.

5.      On January 28, 2008, after the market closed, MuniMae stated that it was
drastically reducing its dividend by more than a third and would likely restate its financial state-
ments for the years ended December 31, 2004 and 2005, and that it would file its Form10-K for
the year ended December 31, 2006, by May 30, 2008. As a result, MuniMae noted that it
expected the NYSE to suspend trading of its common stock and shortly commence delisting
procedures. In a Form 8-K filed with the SEC before the market opened on January 29, 2008,
MuniMae disclosed that its pending restatement would reflect changes to its accounting policies,
including, among other things, the consolidation of financial statements of 200 variable interest
entities in which it had partnership interests under Financial Accounting Standards Board's
Financial Interpretation No. 46 ("FIN 46"), changes to the recognition of revenue for its low
income housing tax credit business, the way MuniMae accounts for loans, and the method in
how MuniMae accounts for derivatives that affect the timing of profit and loss recognition.

6.      As a result, the market price of MuniMae's common stock fell over 46% and

closed at $9.19 per share on January 29, 2008, on extraordinarily high trading volume of nearly 3.8 million shares.

7.     On January 30, 2008, MuniMae further disclosed in a press release that effective February 6, 2008, its common stock would be delisted from the NYSE and would begin trading over-the-counter on the Pink Sheets because it failed to meet "the NYSE's March 3, 2008 deadline to file audited financial statements for the 2006 fiscal year." In addition, on the same day, MuniMae filed a Form 8-K with the SEC in which it stated that the restatement was "taking so long and costing so much" because the assets of its limited partner interests had "to be included in our consolidated financial statements" and the "inclusion of those partnerships has to be done manually from the financial records of the partnerships, because we do not currently have systems to do this automatically."

8.     Consequently, the price of MuniMae common stock fell an additional 22% on January 30, 2008, to close at $7.13.

9.     On February 5, 2008, MuniMae issued a press release announcing that beginning the next trading day, MuniMae common stock would trade over-the-counter on the Pink Sheets under the symbol, "MMAB." That is where it now trades.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to: (a) Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and (b) 28 U.S.C. §§ 1331 and 1337.

11.     This action arises under and pursuant to: Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

12.     In connection with the acts alleged in this complaint, defendants, directly or

3

indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NYSE Global Select Market ("NYSE"), a national securities exchange.

## PARTIES

13.     Plaintiff Naomi Raphael ("Plaintiff") purchased MuniMae common stock during the Class Period, as set forth in the attached Certification, and was damaged thereby.

14.     Defendant MuniMae is a Delaware limited liability company that provides debt and equity financing to various parties, invests in tax-exempt bonds and other housing-related debt and equity investments, and is a tax credit syndicator that acquires and transfers low-income housing tax credits. MuniMae maintains offices at 99 Park Avenue, New York, N.Y. 10016.

15.     Defendant Mark J. Joseph ("Joseph") was, at all relevant times, MuniMae's Chairman of the Board of Directors. Joseph also served as MuniMae's Chief Executive Officer between 1996 and December 31, 2004. During the Class Period, defendant Joseph sold approximately 179,815 MuniMae shares for proceeds of approximately \$4.7 million.

16.     Defendant Michael L. Falcone ("Falcone") was, at all relevant times, a member of MuniMae's Board of Directors. Since January 1, 2005, Falcone has also served as MuniMae's Chief Executive Officer and President. Prior to that, Falcone was MuniMae's President and Chief Operating Officer. During the Class Period, defendant Falcone sold approximately 48,095 MuniMae shares for proceeds of approximately \$1.2 million.

17.     Defendant William S. Harrison ("Harrison") was, MuniMae's Executive Vice President and Chief Financial Officer until December 2005. During the Class Period, defendant Harrison sold approximately 43,000 MuniMae shares for proceeds of approximately \$1.1 million.

4

18. Defendant Melanie M. Lundquist ("Lundquist") served as MuniMae's Chief Financial Officer and Executive Vice President between December 2005 through July 10, 2007, and had previously served as MuniMae's Senior Vice President and Chief Accounting Officer beginning March 2005.

19. Defendant David B. Kay ("Kay") has been MuniMae's Chief Financial Officer since November 2007.

20. Defendant Charles C. Baum ("Baum") was, at all relevant times, a member of MuniMae's Board of Directors and a member of its Audit Committee.

21. Defendant Eddie C. Brown ("Brown") was, at all relevant times, a member of MuniMae's Board of Directors and a member of its Audit Committee.

22. Defendant Robert S. Hillman ("Hillman") was, at all relevant times, a member of MuniMae's Board of Directors and a member of its Audit Committee.

23. Defendant Arthur S. Mehlman ("Mehlman") was, at all relevant times, a member of MuniMae's Board of Directors and a member of its Audit Committee.

24. Defendant Fred N. Pratt, Jr. ("Pratt") was, at all relevant times, a member of MuniMae's Board of Directors and the Chairman of its Audit Committee.

25. The individuals named as defendants in ¶¶ 20-24 are referred to below as the "Audit Committee Defendants." According to the Amended and Restated Audit Committee Charter that MuniMae filed with the SEC as part of its Form DEF 14A filed on July 19, 2006, defendants Baum, Brown, Hillman, Mehlman and Pratt, as members of the Audit Committee, were required to:

> 1) Review with representatives of management and the independent public accountants the Company's audited financial statements prior to their filing as part of the annual report on Form 10-K. These discussions shall include consideration of the quality

5

of the Company's accounting principles as applied in its financial reporting, which would entail review of estimates, reserves and accruals, review of audit adjustments whether or not recorded and such other inquiries as may be appropriate. Based on the review, the Committee shall make its recommendation to the Board as to the inclusion of the Company's audited financial statements in the Company's Annual Report on Form 10-K.

2)    Consider the integrity of the Company's financial reporting process and controls in consultation with management and the Company's independent public accountants. Discuss significant financial risk exposures and the steps management has taken to assess, monitor, control and report such exposures. Review significant findings prepared by the independent public accountants and the internal audit function together with management's responses including the status of previous recommendations.

3)    Review with financial management and the independent auditors the Company's quarterly financial results prior to the release of earnings and/or the Company's quarterly financial statements prior to filing or distribution of the Company's Quarterly Reports on Form 10-Q.

4)    The Committee shall have the ultimate authority and responsibility to select, evaluate and, when warranted, replace independent public accountants (or to recommend such replacement for shareholder approval in any proxy statement, if applicable). The Committee shall approve the fees and other compensation to be paid to the independent public accountants. The independent public accountants shall be ultimately accountable to the Board and the Committee.

5)    Consider and discuss with management and the independent auditors any audit problems or difficulties encountered in the course of audit work including any restrictions on the scope of activities or access to required information and any significant disagreements with management.

6)    Review significant reports prepared by the internal audit function together with management's response and follow-up to these reports.

7)    On at least an annual basis, review with the Company's inside and outside counsel any legal matters that could have a significant impact on the Company's financial statements, the Company's compliance with applicable laws and regulations and inquiries received from regulators or governmental agencies.

8)    Periodically review management's monitoring of the Company's compliance with its Code of Ethics and Principles of Business Integrity, and ensure that management has the proper review system in place to ensure that the Company's financial statements, reports, and other financial information disseminated to governmental organizations and the public satisfy legal requirements.

9)    Discuss the Company's policies with respect to risk assessment and risk management, including the Company's major financial accounting and risk exposures and the steps management has undertaken to control them.

10)   Periodically review the Company's Anti-Fraud Program, make recommendations to improve the program as considered necessary and ensure that management has established a system to enforce this Program.

11)   Discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

12)   Take, or recommend that management take, appropriate measures to rectify any fraud or other accounting or financial reporting irregularities discovered by the Committee and, in connection therewith, engage senior management and inside and/or outside counsel, as appropriate, in connection therewith.

26.    The individuals named as defendants in ¶¶ 15-24 are collectively referred to below as the "Individual Defendants." The Individual Defendants, because of their positions with MuniMae, while each held the positions described above, possessed the power and authority to control the contents of MuniMae's annual reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Defendants Joseph, Falcone, Harrison, Lundquist and Kay were provided with copies of MuniMae's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to — and were

7

being concealed from — the public, and that the positive representations that were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

27. MuniMae provides debt and equity financing to developers of multi-family housing and other types of commercial real estate. It invests in tax-exempt mortgage revenue bonds issued by state and local authorities to finance multi-family housing developments. MuniMae operates in several business segments: (1) the debt segment, which invests in tax exempt bonds and bond securitizations, and permanent loans, and provides loan servicing; (2) the tax credit equity segment, which provides tax credit equity syndication and asset management services; (3) the structured finance segment, which invests in other real estate-related secureties, including equity investments in real estate operating partnerships; and (4) the fund management segment, which provides loan origination, asset management and other related services, and invests in real estate operating partnerships. In September 2007, MuniMae acquired SLF Management, LLC, also known as the Sustainable Land Fund (SLF). MuniMae's shares were traded on the New York Stock Exchange ("NYSE") under the symbol, MMA, until it was delisted from the NYSE on February 6, 2008.

### False And Misleading Statements During The Class Period

28. On May 3, 2004, the defendants caused MuniMae to issue a press release announcing financial results for its first quarter ended March 31, 2004. Specifically, MuniMae "reported net income allocated to common shares of $1.2 million for the quarter ended March 31, 2004 compared to $13.9 million for the same period in 2003. Diluted earnings per share

8

were $0.04 for the quarter, compared to $0.50 for the same period in 2003." Further, the press

release stated, in relevant part, the following:

> The Company reported Cash Available for Distribution ("CAD")
> per common share of $0.37 for the quarter ended March 31, 2004,
> a decrease of 26% as compared with CAD per common share of
> $0.50 for the same period in 2003. (The Company uses CAD as its
> primary measure of performance and believes it to be illustrative of
> its distribution-paying ability. CAD differs from net income
> because of variations between GAAP income and actual cash
> received. These variations are described in the note to the attached
> calculation of CAD statement.)

In the press release, defendant Joseph commented the following:

> We are very pleased with the Company's results for the first
> quarter. As we had previously advised our investors, we expected
> first quarter results to come in below the prior-year figures due to
> seasonality in our tax credit equity syndication business, which we
> significantly expanded through a July 2003 acquisition. While our
> CAD per share for the first quarter of 2004 did come in below the
> prior-year results, it significantly exceeded our expectations. This
> was largely due to strong results in our tax credit equity unit during
> the quarter. Based in part on the Company's results and our
> outlook for the remainder of the year, our Board of Directors
> recently raised the quarterly distribution to holders of our common
> shares to $0.4575, an increase of 3% over the same period in 2003.

29.     On May 6, 2004, the defendants caused MuniMae to file its quarterly report on

Form 10-Q with the SEC for the quarter ended March 31, 2004. Its Form 10-Q was signed by

defendants Joseph and Harrison and reaffirmed its financial results previously announced on

May 3, 2004.  The Form 10-Q also contained certifications signed by defendants Joseph and

Harrison pursuant to §§ 302 and 906 of the Sarbanes-Oxley Act of 2002.

30.     In addition, MuniMae represented in the Form 10-Q, in relevant part, the

following:

**New Accounting Pronouncements**

9

In January 2003, the Financial Accounting Standards Board ("FASB") approved Financial Interpretation No. 46, "Consolidation of Variable Interest Entities" ("FIN 46"). FIN 46 requires the consolidation of a company's equity investment in a variable interest entity ("VIE") if the company is the primary beneficiary of the VIE and if risks are not effectively dispersed among the owners of the VIE. The company is considered to be the primary beneficiary of the VIE if the company absorbs the majority of the losses of the VIE. FIN 46 is effective for VIEs created after January 31, 2003. For any VIE in which the Company held an interest that it acquired before February 1, 2003, FIN 46 was effective for the first interim reporting period beginning after June 15, 2003. In December 2003, FASB approved various amendments to FIN 46 and released a revised version of FIN 46 ("FIN 46-R"). In addition, FASB extended the effective date of FIN 46 until the first reporting period ending after March 15, 2004 for VIEs which are not special purpose entities, and the Company elected to defer adoption of that portion of FIN 46 until that time.

The Company's residual interests in bond securitizations represent equity interests in VIEs, and the Company is the primary beneficiary of those VIEs. The Company determined that its residual interests in bonds were special purpose entities and did not qualify for the deferral. Therefore, these securitization trusts were consolidated at December 31, 2003.

The Company has general partner interests in low-income housing tax credit equity funds where the respective funds have one or more limited partners. The determination of whether the Company is the primary beneficiary of (and must consequently consolidate) a given tax credit equity fund depends on a number of factors, including the number of limited partners and the rights and obligations of the general and limited partners in that fund. Upon adoption of FIN 46 in March 2004, the Company determined that it is the primary beneficiary in certain of the funds it originates where there are multiple limited partners. As a result, the Company consolidated these equity investments at March 31, 2004. The Company's general partner interests typically represent a one percent or less interest in each fund. For those funds which it consolidates, the Company reports the net assets of the funds, consisting primarily of restricted cash, investments in partnerships and notes payable, in the Company's consolidated balance sheet. In addition, the limited partnership interests in the funds, owned by third party investors, are reported as a minority interest. The net income (loss) from these tax credit equity funds is reported in the appropriate line items of the Company's consolidated statement of

income. An adjustment for the income (loss) allocable to the limited partners (investors) in the funds is recorded through minority interest expense (income) in the Company's consolidated statements of income. At March 31, 2004, the Company recorded net assets of these tax credit equity funds of $1.3 billion, consisting primarily of $1.4 billion in investment in partnerships, $133.1 million in restricted assets and $208.7 million in notes payable, which are non-recourse to the Company. The Company recorded $1.3 billion in minority interest in subsidiary companies. As of March 31, 2004, the Company also recorded a $0.5 million cumulative effect of a change in accounting principle as a result of recording the net equity allocable to the Company's general partner interest in the funds. The Company also has a general partner interest in certain other low-income housing tax credit equity funds where it has concluded that it is not the primary beneficiary. Accordingly, funds with assets of $970.3 million and liabilities of $90.8 million at March 31, 2004 have not been consolidated and continue to be accounted for using the equity method of accounting.

## INVESTMENT IN TAX-EXEMPT BONDS

The Company originates investments in tax-exempt bonds and taxable loans primarily to the affordable multifamily housing industry. Tax-exempt bonds are issued by state and local government authorities to finance multifamily housing developments or other real estate financings. The bonds are typically secured by nonrecourse mortgage loans on the underlying properties.

The Company invests in other housing-related securities, including tax-exempt bonds issued by community development districts, to finance the development of infrastructure supporting single-family housing or commercial developments and secured by specific payments or assessments pledged by the local improvement district that issues the bonds. The Company also invests in tax-exempt bonds, or interests in bonds, secured by student housing or assisted living developments.

The Company's sources of capital to fund these lending activities include proceeds from equity and debt offerings, securitizations, notes and warehousing facilities with various pension funds and commercial banks, and draws on lines of credit. The Company earns interest income from its investment in tax-exempt bonds and taxable loans. The Company also earns origination and construction administration fees, through subsidiaries classified as

11

corporations for Federal income tax purposes, for originating and servicing the bonds during the construction period.

\*\*\*

As of March 31, 2004 and December 31, 2003, the Company held \$1,097.8 million and \$1,044.0 million of tax-exempt bonds, respectively.

\*\*\*

### INVESTMENT IN PARTNERSHIPS

The Company's investments in partnerships consist of equity interests in real estate operating partnerships. The Company's investments in partnerships are accounted for using the equity method.

For partnerships in which the Company is a limited partner, the Company ceases recording losses on an investment in partnership when the cumulative losses and distributions from the partnership exceed the Company's original investment and, after the Company's investment in such partnership reaches \$0, cash distributions received from these investments are recorded as income. For partnerships in which the Company is a general partner (for example, the Company's interests in the tax credit equity syndication funds which it originates and the Company's Joint Ventures with CAPREIT, Inc. and its affiliates ("CAPREIT")), the Company recognizes losses to the extent of its partnership liability, regardless of the Company's basis in its partnership interest.

31.     The representations set forth in ¶¶ 28-30 were materially false and misleading when issued because:

(a)     the reported financial results failed to include the financial effect of 200 partnerships which were not properly put on the balance sheet;

(b)     defendants' failure to properly account for these 200 partnerships caused MuniMae's liabilities to be materially understated and thereby caused shareholders' equity to be materially overstated;

(c)     defendants failed to disclose that MuniMae had maintained artificially

12

inflated asset values on a significant portion of its tax-exempt bond portfolio and had not properly recognized impairments in its loan portfolio;

(d) MuniMae had materially overstated its profitability by failing to properly account for its results of operations and by artificially inflating its financial results, gross margins and net income;

(e) defendants failed to disclose that MuniMae had failed to maintain adequate internal accounting controls and procedures, and was therefore unable to ascertain its true financial condition; and

(f) as a result of the foregoing, MuniMae's statements about its assets and liabilities, earnings, financial well-being and future prospects lacked a reasonable basis when made.

32. On August 2, 2004, the defendants caused MuniMae to issue a press release announcing financial results for its second quarter ended June 30, 2004. Specifically, MuniMae "reported net income allocated to common shares of $11.2 million for the quarter ended June 30, 2004 compared to $31.1 million for the same period in 2003. Diluted earnings per share were $0.32 for the quarter, compared to $1.06 for the same period in 2003." Further, the press release, in relevant part, stated the following.

> The Company reported Cash Available for Distribution ("CAD") per common share of $0.61 for the quarter ended June 30, 2004, an increase of 17% as compared with CAD per common share of $0.52 for the same period in 2003. (The Company uses CAD as its primary measure of performance and believes it to be illustrative of its distribution-paying ability. The differences between GAAP and CAD are described in the note to the attached calculation of CAD statement.)

In the press release, defendant Joseph was quoted as stating the following:

> We are extremely pleased to have been able to raise our distribution for thirty consecutive quarters. So far this year we are

13

>outperforming our own and analysts' expectations, particularly in our tax credit equity business, and we expect to finish the year somewhere between 2% and 4% above analyst current consensus expectations of $2.22.

33.   On August 6, 2004, the defendants caused MuniMae to file its quarterly report on

a Form 10-Q with the SEC for the second quarter ended June 30, 2004. The Form 10-Q was

signed by defendant Harrison and reaffirmed MuniMae's financial results previously announced

on August 2, 2004. The Form 10-Q also contained certifications signed by defendants Joseph and

Harrison pursuant to §§ 302 and 906 of the Sarbanes-Oxley Act of 2002.

34.   In addition, MuniMae represented in the Form 10-Q, in relevant part, the

following:

> *Other-than-Temporary Impairments and Valuation Allowances on Investments*
>
> The Company evaluates its investments on an ongoing basis to determine whether other-than-temporary impairments exist or a valuation allowance is needed. The Company considers the credit risk exposure of the investment, the Company's ability and intent to hold the investment for a period of time to allow for anticipated recoveries in market value, the length of time and extent to which the market value has been less than carrying value, the financial condition of the underlying collateral including the payment status of the investment and general economic and other more specific conditions applicable to the investment, other collateral available to support the investment and whether the Company expects to recover all amounts due under its mortgage obligations on a net present value basis. Third party quotes of securities with similar characteristics or discounted cash flow valuations are used to assist in determining if an impairment exists on investments. If the fair value of the investment is less than its amortized cost, and after assessing the above-mentioned factors it is determined that an other-than-temporary impairment exists, the impairment is recorded currently in earnings and the cost basis of the security is adjusted accordingly. When the Company believes that it is probable that it will not collect all amounts due, including principal and interest, under the terms of an investment, it records a valuation allowance. The Company also evaluates other receivables and advances for collectibility on an ongoing basis.

14

When the Company believes it is probable that it will not collect all amounts due, the balance is written down to its realizable value.

\*\*\*

*New Accounting Pronouncements*

In January 2003, the Financial Accounting Standards Board ("FASB") approved Financial Interpretation No. 46, "Consolidation of Variable Interest Entities" ("FIN 46"). FIN 46 requires the consolidation of a company's equity investment in a VIE if the company is the primary beneficiary of the VIE and if risks are not effectively dispersed among the owners of the VIE. The company is considered to be the primary beneficiary of the VIE if the company absorbs the majority of the losses of the VIE. FIN 46 is effective for VIEs created after January 31, 2003. For any VIE in which the Company held an interest that it acquired before February 1, 2003, FIN 46 was effective for the first interim reporting period beginning after June 15, 2003. In December 2003, FASB approved various amendments to FIN 46 and released FIN 46R. In addition, FASB extended the effective date of FIN 46 until the first reporting period ending after March 15, 2004 for VIEs which are not special purpose entities, and the Company elected to defer adoption of that portion of FIN 46 until that time.

The Company's residual interests in bond securitizations represent equity interests in VIEs, and the Company is the primary beneficiary of those VIEs. The Company determined that its bond securitization trusts were special purpose entities ("SPEs") and did not qualify for the deferral. Therefore, these securitization trusts were consolidated at December 31, 2003. The Company examined each of its SPEs to determine if it meets the definition of a qualified SPE. Certain of the Company's SPEs are qualified SPEs and are not consolidated accordingly.

The Company initially measured the assets and liabilities of the securitization trusts at the carrying amounts.

The Company has general partnership interests in low-income housing tax credit equity funds where the respective funds have one or more limited partners. The determination of whether the Company is the primary beneficiary of (and must consequently consolidate) a given tax credit equity fund depends on a number of factors, including the number of limited partners and the rights and obligations of the general and limited partners in that fund. Upon adoption of FIN 46 in March 2004, the Company determined that it was the primary beneficiary in certain of the funds it originated

15

where there are multiple limited partners. As a result, the Company consolidated these equity investments at March 31, 2004. The Company's general partner interests typically represent a one percent or less interest in each fund. For those funds which it consolidates, the Company reports the net assets of the funds, consisting primarily of restricted cash, investments in partnerships and notes payable, in the Company's consolidated balance sheet. In addition, the limited partnership interests in the funds, owned by third party investors, are reported as a minority interest. The net income (loss) from these tax credit equity funds is reported in the appropriate line items of the Company's consolidated statement of income. An adjustment for the income (loss) allocable to the limited partners (investors) in the funds is recorded through minority interest expense (income) in the Company's consolidated statement of income. At March 31, 2004, the Company recorded net assets of these tax credit equity funds of $1.2 billion, consisting primarily of $1.4 billion in investment in partnerships, $129.5 million in restricted assets and $208.7 million in notes payable, which are non-recourse to the Company. The Company recorded $1.2 billion in minority interest in subsidiary companies. As of March 31, 2004, the Company also recorded a $0.5 million cumulative effect of a change in accounting principle as a result of recording the net equity allocable to the Company's general partner interest in the funds.

At times, the Company takes ownership of the general partnership interest in the underlying Project Partnerships in which the tax credit funds hold investments. For those property-level general partnership interests (a) owned by the Company and (b) relating to Project Partnerships included in tax credit funds consolidated pursuant to FIN 46, the Company has discontinued the equity method of accounting and consolidated the underlying Project Partnership. Such consolidation was recorded in the second quarter and resulted in an increase in assets of $172.0 million, an increase in liabilities of $172.0 million and net income of zero. The Company also has a general partnership interest in certain other low income housing tax credit equity funds where it has concluded that it is not the primary beneficiary. Accordingly, funds with assets of $970.3 million and liabilities of $90.8 million as of March 31, 2004 have not been consolidated and continue to be accounted for using the equity method.

The Company initially measured the assets and liabilities of the tax credit equity funds at fair value as of July 1, 2003, the acquisition date of HCI, which was the point in time that the Company first met the criteria to be the primary beneficiary of the VIE. For funds

16

consolidated pursuant to FIN 46 as of March 31, 2004, the fair value was used to record the net assets of the tax credit equity funds when the fair value was less than the carrying amount. For funds where the Company took ownership of the general partnership interest in the underlying Project Partnership in which the fund held an investment, the underlying Project Partnership was recorded at cost in consolidation.

\*\*\*

## INVESTMENT IN TAX-EXEMPT BONDS

The Company originates for its own account investments in tax-exempt bonds. Tax-exempt bonds are issued by state and local government authorities to finance multifamily housing developments or other real estate. The bonds are typically secured by nonrecourse mortgage loans on the underlying properties.

The Company invests in other housing-related securities, including tax-exempt bonds issued by community development districts, to finance the development of infrastructure supporting single-family housing or commercial developments and secured by specific payments or assessments pledged by the local improvement district that issues the bonds. The Company also invests in tax-exempt bonds, or interests in bonds, secured by student housing or assisted living developments.

The Company's sources of capital to fund these lending activities include proceeds from equity and debt offerings, securitizations, loans from warehousing facilities with various pension funds and commercial banks, and draws on lines of credit. The Company earns interest its investment in tax-exempt bonds and taxable loans. The Company also earns origination and construction administration fees, through subsidiaries classified as corporations for Federal income tax purposes, for originating and servicing the bonds during the construction period.

\*\*\*

As of June 30, 2004 and December 31, 2003, the Company held $1,180.2 million and $1,044.0 million of tax-exempt bonds, respectively.

\*\*\*

## INVESTMENT IN PARTNERSHIPS

The Company's investments in partnerships consist of equity interests in real estate operating partnerships. The Company's investments in partnerships are accounted for using the equity

17

method. The Company ceases recording losses on an investment in partnership when the cumulative losses and distributions from the partnership exceed the carrying amount of the investment and any advances made by the Company. After the Company's investment in such partnership reaches $0, cash distributions received from these investments are recorded as income. For partnerships in which the Company is a general partner (for example, the Company's interests in the tax credit equity syndication funds which it originates), the Company recognizes losses to the extent of its partnership liability, regardless of the Company's basis in its partnership interest.

35.     The representations contained in ¶¶ 32-34 were materially false and misleading

for the reasons set forth in ¶ 31, above.

36.     On November 9, 2004, the defendants caused MuniMae to file its quarterly report

on Form 10-Q with the SEC for the quarter ended September 30, 2004. MuniMae's Form 10-Q

was signed by defendant Harrison and stated its financial results. The Form 10-Q also contained

certifications signed by defendants Joseph and Harrison pursuant to §§ 302 and 906 of the

Sarbanes-Oxley Act of 2002.

37.     In addition, MuniMae represented in the Form 10-Q, in relevant part, the

following:

> *Other-than-Temporary Impairments and Valuation Allowances on Investments*
>
> The Company evaluates its investments on an ongoing basis to determine whether other-than-temporary impairments exist or a valuation allowance is needed. The Company considers the credit risk exposure of the investment, the Company's ability and intent to hold the investment for a period of time to allow for anticipated recoveries in market value, the length of time and extent to which the market value has been less than carrying value, the financial condition of the underlying collateral including the payment status of the investment and general economic and other more specific conditions applicable to the investment, other collateral available to support the investment and whether the Company expects to recover all amounts due under its mortgage obligations on a net present value basis. Third party quotes of securities with similar

18

characteristics or discounted cash flow valuations are used to assist in determining if an impairment exists on investments. If the fair value of the investment is less than its amortized cost and after assessing the above-mentioned factors, it is determined that an other-than temporary impairment exists, the impairment is recorded currently in earnings and the cost basis of the security is adjusted accordingly. When the Company believes that it is probable that it will not collect all amounts due, including principal and interest, under the terms of an investment, it records a valuation allowance. The Company also evaluates other receivables and advances for collectibility on an ongoing basis. When the Company believes it is probable that it will not collect all amounts due, the balance is written down to its realizable value.

***

*New Accounting Pronouncements*

In January 2003, the Financial Accounting Standards Board ("FASB") approved Financial Interpretation No. 46, "Consolidation of Variable Interest Entities" ("FIN 46"). FIN 46 requires the consolidation of a company's equity investment in a VIE if the company is the primary beneficiary of the VIE and if risks are not effectively dispersed among the owners of the VIE. The company is considered to be the primary beneficiary of the VIE if the company absorbs the majority of the losses of the VIE. FIN 46 is effective for VIEs created after January 31, 2003. For any VIE in which the Company held an interest that it acquired before February 1, 2003, FIN 46 was effective for the first interim reporting period beginning after June 15, 2003. In December 2003, FASB approved various amendments to FIN 46 and released FIN 46R. In addition, FASB extended the effective date of FIN 46 until the first reporting period ending after March 15, 2004 for VIEs which are not special purpose entities, and the Company elected to defer adoption of that portion of FIN 46 until that time.

The Company's residual interests in bond securitizations represent equity interests in VIEs, and the Company is the primary beneficiary of those VIEs. The Company determined that its bond securitization trusts were special purpose entities ("SPEs") and did not qualify for the deferral. Therefore, these securitization trusts were consolidated at December 31, 2003. The Company examined each of its SPEs to determine if it meets the definition of a qualified SPE. Certain of the Company's SPEs are qualified SPEs and are not consolidated accordingly.

The Company initially measured the assets and liabilities of the securitization trusts at the carrying amounts.

The Company has general partnership interests in low-income housing tax credit equity funds where the respective funds have one or more limited partners. The determination of whether the Company is the primary beneficiary of (and must consequently consolidate) a given tax credit equity fund depends on a number of factors, including the number of limited partners and the rights and obligations of the general and limited partners in that fund. Upon adoption of FIN 46R in March 2004, the Company determined that it was the primary beneficiary in certain of the funds it originated where there are multiple limited partners. As a result, the Company consolidated these equity investments at March 31, 2004. The Company's general partner interests typically represent a one percent or less interest in each fund. For those funds which it consolidates, the Company reports the net assets of the funds, consisting primarily of restricted cash, investments in real estate partnerships and notes payable, in the Company's consolidated balance sheet. In addition, the limited partnership interests in the funds, owned by third party investors, are reported as a minority interest. The net income (loss) from these tax credit equity funds is reported in the appropriate line items of the Company's consolidated statement of income. An adjustment for the income (loss) allocable to the limited partners (investors) in the funds is recorded through minority interest expense (income) in the Company's consolidated statement of income. At March 31, 2004, the Company recorded net assets of these tax credit equity funds of $1.2 billion, consisting primarily of $1.4 billion in investment in partnerships, $129.5 million in restricted assets and $208.7 million in notes payable, which are non-recourse to the Company. The Company recorded $1.2 billion in minority interest in subsidiary companies. As of March 31, 2004, the Company also recorded a $0.5 million cumulative effect of a change in accounting principle as a result of recording the net equity allocable to the Company's general partner interest in the funds.

At times, the Company takes ownership of the general partnership interest in the underlying Project Partnerships in which the tax credit equity funds hold investments. For those property-level general partnership interests (a) owned by the Company and (b) relating to Project Partnerships included in tax credit equity funds consolidated pursuant to FIN 46R, the Company has discontinued the equity method of accounting and consolidated the underlying Project Partnership. Such consolidation was recorded in the second quarter and resulted in an increase in assets of $172.0 million, an

increase in liabilities of $172.0 million and net income of zero. The Company also has a general partnership interest in certain other low-income housing tax credit equity funds where it has concluded that it is not the primary beneficiary. Accordingly, funds with assets of $970.3 million and liabilities of $90.8 million as of March 31, 2004 have not been consolidated and continue to be accounted for using the equity method.

The Company initially measured the assets and liabilities of the tax credit equity funds at fair value as of July 1, 2003, the acquisition date of HCI, which was the point in time that the Company first met the criteria to be the primary beneficiary of the VIE. For funds consolidated pursuant to FIN 46R as of March 31, 2004, the fair value was used to record the net assets of the tax credit equity funds when the fair value was less than the carrying amount. For funds where the Company took ownership of the general partnership interest in the underlying Project Partnership in which the fund held an investment, the underlying Project Partnership was recorded at cost in consolidation.

***

### INVESTMENT IN TAX-EXEMPT BONDS

The Company originates for its own account investments in tax-exempt bonds. Tax-exempt bonds are issued by state and local government authorities to finance multifamily housing developments and other types of real estate. The bonds are typically secured by nonrecourse mortgage loans on the underlying properties.

The Company invests in other housing-related securities, including tax-exempt bonds issued by community development districts, to finance the development of infrastructure supporting single-family housing or commercial developments and secured by specific payments or assessments pledged by the local improvement district that issues the bonds. The Company also invests in tax-exempt bonds, or interests in bonds, secured by student housing or assisted living developments.

The Company's sources of capital to fund these lending activities include proceeds from equity and debt offerings, securitizations, loans from warehousing facilities with various pension funds and commercial banks, and draws on lines of credit. The Company earns interest income from its investment in tax-exempt bonds and taxable loans. The Company also earns origination and construction administration fees, through subsidiaries classified as

corporations for Federal income tax purposes, for originating and
servicing the bonds during the construction period.

***

As of September 30, 2004 and December 31, 2003, the Company
held $1,220.4 million and $1,044.0 million of tax-exempt bonds,
respectively.

***

## INVESTMENT IN PARTNERSHIPS

The Company's investments in partnerships consist of equity
interests in real estate operating partnerships. The Company's
investments in partnerships are accounted for using the equity
method. The Company ceases recording losses on an investment in
partnership when the cumulative losses and distributions from the
partnership exceed the carrying amount of the investment and any
advances made by the Company. After the Company's investment
in such partnership reaches zero, cash distributions received from
these investments are recorded as income. For partnerships in
which the Company is a general partner (for example, the
Company's interests in the tax credit equity syndication funds
which it originates), the Company recognizes losses to the extent
of its partnership liability, regardless of the Company's basis in its
partnership interest.

38.     On November 10, 2004, the defendants caused MuniMae to issue a press release

announcing financial results for its third quarter. Specifically, MuniMae "reported net income of

$11.6 million for the quarter ended September 30, 2004, as compared to $18.1 million for the

same period in 2003. Diluted earnings per share were $0.33 for the quarter, compared to $0.62

for the same period in 2003." Further, the press release, in relevant part, stated the following:

> The Company reported Cash Available for Distribution ("CAD")
> per common share of $0.72 for the quarter ended September 30,
> 2004, an increase of 36% as compared with CAD per common
> share of $0.53 for the same period in 2003. (The Company uses
> CAD as its primary measure of performance and believes it to be
> illustrative of its distribution-paying ability. The differences
> between GAAP and CAD are described in the note to the attached
> calculation of CAD statement.)

In the press release, defendant Joseph was quoted as stating the following:

> MuniMae is pleased to continue its long history of steady growth
> in cash generated by our businesses. The Company has recently

22

declared its 31st consecutive increase in its distribution to common shareholders. Despite higher regulatory and compliance costs, particularly those related to the Sarbanes-Oxley Act of 2002 our management team continues to deliver strong results.

39.     The representations contained in ¶¶ 36-38 were materially false and misleading for the reasons set forth in ¶ 31, above.

40.     On March 16, 2005, the defendants caused MuniMae to issue a press release announcing financial results for its fourth quarter and year ended December 31, 2004. The press release, in relevant part, stated the following:

For the three and twelve months ended December 31, 2004, MuniMae earned net income of approximately $5.6 million and $27.0 million, respectively, down from $9.3 million and $72.5 million for the three and twelve months ended December 31, 2003, respectively. Adjusted to exclude the impact of certain consolidated tax credit equity funds and the financing method of accounting related to guaranteed tax credit equity funds, MuniMae earned net income of $21.8 million and $61.1 million for the three and twelve months ended December 31, 2004, respectively, representing an increase of approximately 55% over similarly adjusted GAAP net income for the three months ended December 31, 2003 and a decrease of 17% for the twelve months ended December 31, 2003.

On a diluted per share basis, net income was $0.16 and $0.78 for the three and twelve months ended December 31, 2004, respectively, down from $0.28 and $2.44 for the three months and twelve months ended December 31, 2003, respectively. Adjusted to exclude the impact of certain consolidated tax credit equity funds and the financing method of accounting related to guaranteed tax credit equity funds, diluted net income per common share was $0.62 and $1.76 for the three months and twelve months ended December 21, 2004, respectively, which represents an increase of 44% from the similarly adjusted $0.43 per share for the three months ended December 31, 2003 and a 29% decrease from the $2.47 per share for the twelve months ended December 31, 2003.

In the press release, defendant Falcone was quoted as stating the following:

By capitalizing on the synergies between our tax credit business and our tax-exempt and taxable lending businesses, we

> successfully structured over $2.5 billion in multifamily and other real estate investments, which is a 68% increase over 2003 production," commented Michael Falcone, Chief Executive Officer of MuniMae. He added, "As a result, our Cash Available for Distribution ("CAD") per common share grew 9% over 2003, representing our 8th consecutive year of CAD per share growth.

41. On March 16, 2005, the defendants caused MuniMae to file its annual report on Form 10-K with the SEC for the year ended December 31, 2004. MuniMae's Form 10-K was signed by defendants Falcone, Joseph, Harrison, Baum, Brown, Hillman, Mehlman, and Pratt and reaffirmed its financial results announced on that day. MuniMae's Form 10-K also contained certifications signed by defendants Falcone and Harrison pursuant to §§ 302 and 906 of the Sarbanes-Oxley Act of 2002.

42. In addition, MuniMae represented in the Form 10-K, in relevant part, the following:

> The Company has general partnership interests in tax credit equity funds where the respective funds have one or more limited partners. The determination of whether the Company is the primary beneficiary of (and must consequently consolidate) a given tax credit equity fund depends on a number of factors, including the number of limited partners and the rights and obligations of the general and limited partners in that fund. Upon adoption of FIN 46R in March 2004, the Company determined that it was the primary beneficiary in certain of the funds it originated where there are multiple limited partners with restrictions on their ability to sell, transfer or pledge their investment. As a result, the Company consolidated these equity investments at March 31, 2004. The Company's general partner interests typically represent a one percent or less interest in each fund. For those funds which it consolidates, the Company reports the assets and liabilities of the funds, consisting primarily of restricted cash, investments in real estate partnerships and notes payable, which are nonrecourse to the Company, in the Company's consolidated balance sheet. In addition, the limited partnership interests in the funds, owned by third party investors, are reported as a minority interest. The net income (loss) from these tax credit equity funds is reported the appropriate line items of the Company's consolidated statement of income. An adjustment for the income (loss) allocable to the

24

limited partners (investors) in the funds is recorded through minority interest (expense) income in the Company's consolidated statement of income. At March 31, 2004, the Company recorded net assets of these tax credit equity funds of $1.2 billion, consisting primarily of $1.4 billion in investment in partnerships, $129.5 million in restricted assets and $208.7 million in notes payable, which are non-recourse to the Company.

The Company recorded $1.2 billion in minority interest in subsidiary companies. As of March 31, 2004, the Company also recorded a $0.5 million cumulative effect of a change in accounting principles as a result of recording the net equity allocable to the Company's general partner interest in the funds.

At times, the Company takes ownership of the general partnership interest in the underlying Project Partnerships in which the tax credit equity funds hold investments. For those property-level general partnership interests the Company has discontinued the equity method of accounting and consolidated the underlying Project Partnership pursuant to FIN 46R. Such consolidation was inadvertently not recorded in the first quarter in conjunction with the adoption of FIN 46R but was recorded in the second quarter of 2004 and resulted in an increase in assets of $172.0 million, an increase in liabilities of $172.0 million, which are non-recourse to the Company, and net income of zero. The Company does not believe that the error in the first quarter was material. At December 31, 2004, $177.5 million of land, building and equipment is collateral for the obligations of the underlying Project Partnership.

The Company also has a general partnership interest in certain other low-income housing tax credit equity funds where it has concluded that it is not the primary beneficiary. Accordingly, funds with assets of $2.1 billion and liabilities of $263.9 million as of December 31, 2004 have not been consolidated and continue to be accounted for using the equity method.

The Company initially measured the assets and liabilities of the tax credit equity funds at fair value as of July 1, 2003, the acquisition date of HCI, which was the point in time that the Company first met the criteria to be the primary beneficiary of the VIE. For funds consolidated pursuant to FIN 46R as of March 31, 2004, the fair value was used to record the net assets of the tax credit equity funds when the fair value was less than the carrying amount. For funds where the Company took ownership of the general partnership interest in the underlying Project Partnership in which the fund held an investment, the underlying Project Partnership

was recorded at cost in consolidation. During the quarter ended December 31, 2004, the Company amended certain of its funds to remove certain restrictions placed on limited partners' ability to sell, transfer or pledge their investments. As a result, funds with assets of $954.8 million and liabilities of $134.6 million have been deconsolidated.

### Investment in Tax-Exempt Bonds and Interests in Bond Securitizations

Investment in tax-exempt bonds and interests in bond securitizations (collectively, "investments in bonds") are accounted for under the provisions of Statement of Financial Accounting Standards No. 115, "Accounting for Certain Investments in Debt and Equity Securities" ("FAS 115"). All investments in bonds are classified and accounted for as available-for-sale debt securities and are carried at fair value. Unrealized gains or losses arising during the period are recorded through other comprehensive income in shareholders' equity, while realized gains and losses and other-than-temporary impairments are recorded through operations. The Company evaluates on an ongoing basis the credit risk exposure associated with these assets to determine whether any other-than-temporary impairments exist in accordance with the Company's policy discussed in the Other-Than-Temporary Impairments on Bonds section of this discussion. Future adverse changes in market conditions or poor operating results from the underlying real estate could result in losses or an inability to recover the carrying value of the investments.

The Company bases the fair value of non-participating bonds (*i.e.*, bonds that do not participate in the net cash flow and net capital appreciation of the underlying properties) and interests in bond securitizations, which also have a limited market, on quotes from external sources, such as brokers, for these or similar bonds or investments. Net operating income is one of the key assumptions used to value the nonparticipating bonds and interests in bond securitizations. Had net operating income been decreased by 10% and 20%, the fair value of the bonds and interests in bond securitizations would have decreased by approximately $35.7 million and $69.2 million, respectively.

The Company determines the fair value of participating bonds that are wholly collateral dependent and for which only a limited market exists by discounting the underlying collateral's expected future cash flows using current estimates of discount rates and capitalization rates. The Company selected discount rates ranging

from 10.1% to 12.9% and capitalization rates ranging from 7.8% to 10.75% for the year ended December 31, 2004. Increasing the discount rates by 50 basis points and the capitalization rates by 100 basis points would result in decreasing the recorded asset on the Company's balance sheet by approximately $12.6 million, with an offsetting decrease to other comprehensive income.

Because the Company's investment in tax-exempt bonds and interests in bond securitizations are secured by non-recourse mortgage loans on real estate properties, the value of the Company's assets is subject to all of the factors affecting bond and real estate values, including macro-economic conditions, interest rate changes, demographics, local real estate markets and individual property performance. Further, many of the Company's investments are subordinated to the claims of other senior interests and uncertainties may exist as to a borrower's ability to meet principal and interest payments.

### Other-Than-Temporary Impairments on Bonds

The Company evaluates on an ongoing basis the credit risk exposure associated with its assets to determine whether other-than-temporary impairments exist or a valuation allowance is needed. The Company considers the credit risk exposure of the investment, the Company's ability and intent to hold the investment for a period of time to allow for anticipated recoveries in market value, the length of time and extent to which the market value has been less than carrying value, the financial condition of the underlying collateral  including the payment status of the investment and general economic and other more specific conditions applicable to the investment, other collateral available to support the investment and whether the Company expects to recover all amounts due under its mortgage obligations on a net present value basis. Third party quotes of securities with similar characteristics or discounted cash flow valuations are used to assist in determining if an impairment exists on investments. If the fair value of the investment is less than its amortized cost, and after assessing the above-mentioned factors, it is determined that an other-than-temporary impairment exists, the impairment is recorded currently in earnings and the cost basis of the security is adjusted accordingly.

\*\*\*

**Investment in Partnerships**

27

> The Company's investments in partnerships consist of equity interests in real estate operating partnerships. The Company's investments in partnerships are accounted for using the equity method. The Company ceases recording losses on an investment in partnership when the cumulative losses and distributions from the partnership exceed the carrying amount of the investment and any advances made by the Company. After the Company's investment in such partnership reaches zero, cash distributions received from these investments are recorded as income. For partnerships in which the Company is a general partner (for example, the Company's interests in the tax credit equity syndication funds which it originates), the Company recognizes losses to the extent of its partnership liability, regardless of the Company's basis in its partnership interest.

43.     The representations contained in ¶¶ 40-42 were materially false and misleading for the reasons set forth in ¶ 31, above.

44.     On May 2, 2005, the defendants caused MuniMae to issue a press release announcing financial results for its first quarter ended March 31, 2005. The press release, in relevant part, stated the following:

> For the three months ended March 31, 2005, MuniMae's net income was $2.2 million, up from a net loss of $1.3 million for the three months ended March 31, 2004. Adjusted to exclude the impact of certain consolidated tax credit equity funds and the financing method of accounting related to guaranteed tax credit equity funds, MuniMae's net income was $12.7 million for the three months ended March 31, 2005, representing an increase of 208% over similarly adjusted GAAP net income for the same period in 2004.
>
> On a diluted per share basis, earnings per share was $0.06 for the three months ended March 31, 2005, as compared with a loss of $0.04 for the three months ended March 31, 2004. Adjusted to exclude the impact of certain consolidated tax credit equity funds and the financing method of accounting related to guaranteed tax credit equity funds, diluted earnings per common share was $0.34 for the three months ended March 31, 2005, which represents an increase of 183% from the similarly adjusted earnings per share for the same period in 2004.

In the press release, defendant Falcone was quoted as stating the following:

28

We had a productive first quarter and remain on track to meet our overall earnings per share and CAD per share targets for fiscal year 2005. Our business volumes continue to grow in our major business segments. In addition, during the quarter we completed a successful public offering of common equity and a private placement of subsidiary trust preferred securities, which together raised $118 million of capital. Finally, we closed a small but strategically important acquisition of an established business, which we have re-branded MMA Realty Capital and which we expect to form the cornerstone of an expanded fund management business targeting pension funds, insurance companies and other institutional investors.

45.     On May 9, 2005, the defendants caused MuniMae to file its quarterly report on

Form 10-Q with the SEC for the first quarter ended March 31, 2005. The Form 10-Q was signed

by defendant Harrison and reaffirmed MuniMae's financial results announced on May 2, 2005.

The Form 10-Q also contained certifications signed by defendants Falcone and Harrison pursuant

to §§ 302 and 906 of the Sarbanes-Oxley Act of 2002.

46.     In addition, MuniMae represented in the Form 10-Q, in relevant part, the

following:

### INVESTMENT IN TAX-EXEMPT BONDS, TAXABLE BONDS AND INTERESTS IN BOND SECURITIZATIONS

The Company originates for its own account and for others investments in tax-exempt bonds. Tax-exempt bonds are issued by state and local government authorities to finance multifamily housing developments or other types of real estate including land infrastructure development. The multifamily bonds are secured primarily by non-recourse mortgage loans on affordable and market rate multifamily housing, while the land infrastructure bonds are secured by sales tax liens and other assessments on the district.

The Company originates for its own account and for others investments in taxable bonds. Taxable bonds are issued by state and local government authorities to finance multifamily housing developments or land infrastructure development. The multifamily bonds are secured primarily by non-recourse mortgage loans on affordable and market rate housing, while the land infrastructure

bonds are secured by sales tax liens and other assessments on the district.

The Company invests in housing-related securities, including CDD bonds. The Company also invests in tax-exempt bonds, or interests in bonds, secured by student housing or assisted living developments.

The Company's sources of capital to fund these lending activities include proceeds from equity and debt offerings, securitizations, loans from warehousing facilities and lines of credit with banks, pension funds and finance companies and cash on hand. The Company earns interest income from its investment in tax-exempt bonds and taxable bonds. The Company also earns origination, construction administration and servicing fees through subsidiaries classified as corporations for Federal income tax purposes, for originating and servicing the bonds.

As of March 31, 2005 and December 31, 2004, the Company held tax-exempt bonds with a fair value of $1,353.0 million and $1,275.7 million and taxable bonds with a fair value of $9.0 million and $9.2 million, respectively.

\*\*\*

### INVESTMENT IN PARTNERSHIPS

The Company's investments in partnerships consist of equity interests in real estate operating partnerships. The Company's investments in partnerships are accounted for using the equity method.

47.     The representations contained in ¶¶ 44-46 were materially false and misleading

for the reasons set forth in ¶ 31, above.

48.     On July 28, 2005, the defendants caused MuniMae to issue a press release

announcing financial results for its second quarter ended June 30, 2005. The press release, in

relevant part, stated the following:

> For the quarter, the Company reported GAAP diluted earnings per share, excluding the effects of FIN 46 and FAS 66, of $0.58, an increase of 5% over the $0.55 per share for the second quarter of 2004. The Company reported Cash Available for Distribution, or CAD, for the second quarter of $0.55 per share, a decrease of 10%

30

> as compared with CAD per share of $0.61 for the second quarter of 2004.

In the press release, defendant Falcone was quoted as stating the following:

> MuniMae had a productive second quarter and, though our year-to-date CAD per share is essentially flat as compared with the first half of 2004, it was above our internal budget. Moreover, based on a review of our pipeline and business prospects for the remainder of the year, we are on track to meet or slightly exceed the current analysts' consensus CAD estimate of $2.41 for fiscal 2005.

> We are increasingly seeing the benefits of the diversification strategy we have pursued for the past six years. While the persistent low interest rate environment is causing pricing pressure in some of our business lines, particularly in our tax-exempt bond business, we are simultaneously benefiting from a strong seller's market for multifamily properties, and we are seeking to take advantage of this market to harvest significant gains on some of our equity investments and bonds. The regular realization of gains on sale has been part of our overall business plan for several years, and the pricing we have seen this year has generally met or exceeded our going-in return expectations for these investments. We remain committed to our strategy of diversifying our product offerings while building scale, both through acquisitions and through organic growth in our existing businesses. In this connection, we are very pleased to have closed the Glaser Financial acquisition, which gives us new product capabilities, additional scale in our DUS lending franchise, geographic diversification in our loan servicing portfolio and a strong management team.

49.     On August 4, 2005, the defendants caused MuniMae to file its quarterly report on

Form 10-Q with the SEC for the second quarter ended June 30, 2005. The Form 10-Q was signed

by defendant Harrison and reaffirmed MuniMae's financial results announced on July 28, 2005.

The Form 10-Q also contained certifications signed by defendants Falcone and Harrison pursuant

to §§ 302 and 906 of the Sarbanes-Oxley Act of 2002.

50.     In addition, MuniMae represented in the Form 10-Q, in relevant part, the

following:

31

## INVESTMENT IN TAX-EXEMPT BONDS, TAXABLE BONDS AND INTERESTS IN BOND SECURITIZATIONS

The Company originates for its own account and for others' investments in tax-exempt and taxable bonds. Tax-exempt and taxable bonds are issued by state and local government authorities to finance multifamily housing developments or other types of real estate, including land infrastructure development (CDD Bonds). The multifamily bonds are secured primarily by non-recourse mortgage loans on affordable and market rate multifamily housing, while the land infrastructure bonds are secured by property tax or sales tax liens and other assessments on the district. The Company also invests in tax-exempt bonds, or interests in bonds, secured by student housing or assisted living developments.

The Company's sources of capital to fund these lending activities include proceeds from equity and debt offerings, securitizations, loans from warehousing facilities and lines of credit with banks, pension funds and finance companies and cash on hand. The Company earns interest income from its investment in tax-exempt bonds and taxable bonds. The Company also earns origination, construction administration and servicing fees through subsidiaries, classified as corporations for Federal income tax purposes, for originating and servicing the bonds.

As of June 30, 2005 and December 31, 2004, the Company held tax-exempt bonds with a fair value of $1,354.1 million and $1,275.7 million and taxable bonds with a fair value of $16.4 million and $9.2 million, respectively.

\*\*\*

## INVESTMENT IN PARTNERSHIPS

The Company's investments in partnerships consist of equity interests in real estate operating partnerships. The Company's investments in partnerships are accounted for using the equity method.

51.     The representations contained in ¶¶ 48-50 were materially false and misleading for the reasons set forth in ¶ 31, above.

52.     On November 7, 2005, the defendants caused MuniMae to issue a press release

announcing financial results for its third quarter ended September 30, 2005. The press release, in

relevant part, stated the following.

> The Company reported diluted earnings per share of $0.52 and
> $1.21 for the three and nine months ended September 30, 2005,
> representing an increase of 58% and 95%, respectively, over
> diluted earnings per share for the comparable periods in 2004. In
> addition, the Company reported Cash Available for Distribution, or
> CAD, of $0.76 and $1.73 per share for the three and nine months
> ended September 30, 2005, representing increases of 6% and 2%,
> respectively, over CAD per share for the comparable periods in
> 2004.

\*\*\*

> For the three months ended September 30, 2005, net income was
> $20.4 million, representing a 77% increase over net income for the
> same period in 2004. Adjusted to exclude the impact of
> consolidated tax credit equity funds and real estate operating
> partnerships as a result of the application of FIN 46R and the
> financing method of accounting related to guaranteed tax credit
> equity funds due to FAS 66, net income was $23.9 million for the
> three months ended September 30, 2005, representing a 52%
> increase over similarly adjusted net income for the same period in
> 2004.

In the press release, defendant Falcone provided the following comments:

> Although our tax-exempt bond originations in 2005 have fallen
> significantly below 2004 levels, production volumes remain strong
> in our other lines of business, and the continued low interest rate
> environment has enabled us to sell selected investments at very
> attractive cap rates. We remain confident in our outlook for the rest
> of the year, and based on our current pipeline, we expect CAD per
> share for the fiscal year 2005 to be at least $2.43.

53.     On November 9, 2005, the defendants caused MuniMae to file its quarterly report

on Form 10-Q with the SEC for the third quarter ended September 30, 2005. MuniMae's Form

10-Q was signed by defendant Harrison and reaffirmed MuniMae's financial results announced

on November 7, 2005. The Form 10-Q also contained certifications signed by defendants

Falcone and Harrison pursuant to §§ 302 and 906 of the Sarbanes-Oxley Act of 2002.

33

54.     In addition, MuniMae represented in the Form 10-Q, in relevant part, the

following:

### TAX-EXEMPT   BONDS,   TAXABLE   BONDS   AND INTERESTS IN BOND SECURITIZATIONS

The Company originates investments in tax-exempt and taxable bonds both for its own account and for others. Tax-exempt and taxable bonds are issued by state and local government authorities to finance multifamily housing developments or other types of real estate, including land infrastructure development. The multifamily bonds are secured primarily by non-recourse mortgage loans on affordable and market rate multifamily housing, while the land infrastructure bonds are secured by property or sales tax liens and other assessments on the district. The Company also invests in tax-exempt bonds, or interests in bonds, secured by student housing or assisted living developments.

The Company's sources of capital to fund these lending activities include proceeds from equity and debt offerings, securitizations, loans from warehousing facilities and lines of credit with banks, pension funds and finance companies and cash on hand. The Company earns interest income from its investment in tax-exempt bonds and taxable bonds. The Company also earns origination, construction    administration    and    servicing    fees    through subsidiaries, classified as corporations for federal income tax purposes, for originating and servicing the bonds.

As of September 30, 2005 and December 31, 2004, the Company held tax-exempt bonds with a fair value of $1,339.4 million and $1,275.7 million, respectively, and taxable bonds with a fair value of $23.7 million and $9.2 million, respectively.

### INVESTMENT IN PARTNERSHIPS

The Company's investments in partnerships consist of equity interests in real estate operating partnerships. The Company's investments in partnerships are accounted for using the equity method.

55.     The representations contained in ¶¶ 52-54 were materially false and misleading

for the reasons set forth in ¶ 31, above.

56.     On March 10, 2006, the defendants caused MuniMae to announce that it would

"restate net earnings for the nine month period ended September 30, 2005 as well as fiscal years

2004, 2003 and 2002 *resulting in higher aggregate net earnings* over this period than

previously reported. *This restatement does not impact cash available for distribution* (CAD) in

any period. CAD is a supplemental non-GAAP performance measure reported by MuniMae in

addition to net earnings." (Emphasis added.) Moreover, MuniMae announced the following:

> For the nine months ended September 30, 2005, and year ended
> December 31, 2004 the Company will be increasing previously
> reported net earnings by $10.5 million ($.27 per diluted share) and
> $19.4 million ($.56 per diluted share), respectively. For the years
> ended December 31, 2003 and 2002, the Company will be
> decreasing net earnings by $4.2 million ($.15 per diluted share)
> and $2.6 million ($.09 per diluted share), respectively. The
> adjustments described above are subject to the completion of the
> review by the Company's independent registered public
> accountants.
>
> In connection with its fourth quarter financial reporting processes,
> the Company identified the need to record certain adjustments
> related to four main areas: 1) recognition of syndication fees, 2)
> application of equity method accounting, 3) recognition of interest
> income, and 4) amortization of mortgage servicing rights. As a
> result of the efforts necessary to reflect the restatements of prior
> periods, the Company expects to file for a 15 day extension to file
> its annual report on Form 10-K for the year ended December 31,
> 2005. Currently, the Company expects that it will file its 2005
> Form 10-K before the expiration of this extension.

57.     On March 16, 2006, the defendants caused MuniMae to file a Form 8-K with the

SEC stating that its Audit Committee concluded "that certain previously issued financial

statements covering the fiscal years ended December 31, 2004, 2003 and 2002, and the quarterly

periods within those years, and the first three quarterly periods in the fiscal year ended December

31, 2005 (the "Affected Financial Statements") should be restated to reflect adjustments to

correct certain errors." It further stated that, thus, the financial statements for the fiscal years of

35

2002 through 2004 should no longer be relied upon. In addition, the Form 8-K stated that MuniMae's management identified material weaknesses related to the financial reporting process, "the recognition of syndication of fees, the application of the equity method of accounting, and the recognition of interest income." Specifically, in connection with MuniMae's financial reporting processes, the management discovered the following errors:

> • The recognition of syndication fees pursuant to Statement of Position No. 92-1, "Accounting for Real Estate Syndication Income;"
>
> • The recognition of interest income on investments in bonds and loans using properly calculated effective yields and the deferral of their direct origination costs;
>
> • The application of the equity method of accounting related to certain investments in partnerships and the valuation of a related derivative financial instrument; and
>
> • The amortization of mortgage servicing rights.

58.     The representations contained in ¶¶ 56 and 57 were materially false and misleading because (1) correctly applying required accounting principles was not beneficial to net earnings as defendants suggested, but would instead seriously impair earnings going forward; (2) MuniMae omitted from its proclamation that historical cash available for distribution (CAD) was unaffected by the pending restatement and going forward would result in lower CAD that was jeopardizing the large dividend that was critical to MuniMae investors; and (3) defendants' statement that they were close to resolving their accounting errors was misleading because, at the time the representations were made, defendants knew or should have known that they would have to manually review and consolidate each of hundreds of partnerships, a process that once undertaken, would take well over a year to complete.

36

59. On April 11, 2006, the defendants caused MuniMae to issue a press release

announcing financial results for its fourth quarter and year ended December 31, 2005. The press

release, in relevant part, stated the following:

> Net earnings were $16.1 million ($.42 per diluted share) for the
> three months ended December 31, 2005, as compared to $17.1
> million ($.48 per diluted share) for the fourth quarter of 2004, as
> restated. For the full year, net earnings were $85.8 million ($2.24
> per diluted share) in 2005, as compared to $50.9 million ($1.46 per
> diluted share) in 2004, as restated. Cash available for distribution
> (CAD) was $29.8 million for the quarter and $95.7 million for the
> year ended December 31, 2005, an increase of 34% and 17%,
> respectively over the comparable amounts for 2004. On a per share
> basis, CAD was $.78 for the three months ended December 31,
> 2005, an increase of 24% over the fourth quarter of 2004. For the
> full year, CAD per share was a record $2.51, an increase of 8%
> over 2004 results.

In the press release, defendant Falcone was quoted as stating the following:

> We accomplished a great deal in 2005. We closed the acquisitions
> of MONY Realty Capital and Glaser Financial which significantly
> expanded the mortgage banking products we offer as well as the
> services we can provide to institutional investors. In addition, we
> reorganized our operations to improve profitability and client
> service for many years to come. With greater diversity of revenue
> sources, a more efficient operating platform and a distribution that
> represents a lower percentage of CAD, MuniMae is well
> positioned for continued growth over the long-term.

60. On June 22, 2006, the defendants caused MuniMae to file its annual report on a

Form 10-K with the SEC for the year ended December 31, 2005. The Form 10-K was signed by

defendants Falcone, Joseph, Lundquist, Baum, Brown, Hillman, Mehlman and Pratt and

reaffirmed MuniMae's financial results announced on April 11, 2006. The Form 10-K also con-

tained certifications signed by defendants Falcone and Lundquist pursuant to §§ 302 and 906 of

the Sarbanes-Oxley Act of 2002.

61. In addition, MuniMae represented in the Form 10-K, in relevant part, the

following:

### Tax-exempt bonds, taxable bonds and interests in bond securitizations

We account for investments in bonds as available-for-sale debt securities under the provisions of Statement of Financial Accounting Standards No. 115, "Accounting for Certain Investments in Debt and Equity Securities" ("FAS 115"). Accordingly, investments in bonds are carried at their estimated fair values and unrealized gains or losses arising during the period are recorded as a component of other comprehensive income. Realized gains and losses and other-than-temporary impairments are included in net income. The basis on which the cost of bonds sold or amounts reclassified out of accumulated other comprehensive income is determined using the specific identification method. We determined the fair value of bonds that participate in the net cash flow and net capital appreciation of the underlying properties and/or that are wholly collateral dependent and for which only a limited market exists by discounting the underlying collateral's expected future cash flows using current estimates of discount rates and capitalization rates. The fair values of all other bonds and interests in bond securitizations are based on quotes from brokers or other external sources.

Most of our interests in bond securitizations represented interests in variable interest entities ("VIEs") under Financial Accounting Standards Board's Financial Interpretations No. 46 (Revised), "Consolidation of Variable Interest Entities" ("FIN 46"). When we have determined that we are the primary beneficiary of the VIE and therefore, are required to consolidate our investments and senior interests, we have made entries to: (1) reclassify our interests in bond securitizations to investment in tax-exempt bonds, (2) reflect the senior interests in the bond securitization trusts in investment in tax-exempt bonds so that the total investment in tax-exempt bonds reported equals the total assets in the securitization trusts, (3) reclassify costs of the securitization transactions to debt issue costs, which are included in other assets and (4) record the senior interests in the securitization trusts as short-term debt. In 2003, we recorded a $1.2 million cumulative effect of a change in accounting principle related to the adoption of FIN 46 as a result of the reversal of gain on sales reported in prior periods on these investments.

We recognize base interest on the bonds as revenue as it accrues. Interest income in excess of the base interest ("Participation

38

Interest") may be available to us through participation features of a bond. Participation Interest is recognized as income when received. Delinquent bonds are placed on non-accrual status for financial reporting purposes when collection of interest is in doubt, which is generally after 90 days of nonpayment. We apply interest payments on non-accrual bonds first to previously recorded accrued interest and, once previously accrued interest is satisfied, as interest income when received. The accrual of interest income is reinstated once a bond's ability to perform is adequately demonstrated and all interest has been paid.

Premiums and discounts are deferred and amortized into interest income using an effective yield over the terms of the related investments. Upon the sale or prepayment of investments in bonds, the unamortized balance of premiums and discounts is recorded as income.

\*\*\*

### Investments in partnerships

Our investments in partnerships consist of equity interests in real estate operating partnerships and income-producing real estate funds. Investments in partnerships are accounted for using the equity method of accounting. We use the equity method when we own an interest in a partnership and can exert significant influence over the partnership's operations but cannot control the partnership's operations. Under the equity method, our ownership interest in the partnership's capital is reported as an investment in our consolidated balance sheets and our allocable share of the income or loss from the partnership is reported as income (loss) from equity investments in partnerships in the consolidated statements of income.

In those instances where we act as the general partner of the tax credit equity funds, we receive a pro rata share of cash distributions that may be distributed to the tax credit equity funds' partners pursuant to a sale of the Project Partnerships or their assets. Our general partner interests in tax credit equity funds range from 0.1% to 1.0%. Other than our fee income, our pro rata share of income and losses from our general partnership interests constitute the primary sources of income or gain and losses from the tax credit equity funds. For partnerships in which we are a general partner (for example, interests we originate in the tax credit equity syndication funds) we recognize losses to the extent of our partnership liability, regardless of our basis in the partnership interest.

62.     On August 1, 2006, MuniMae filed its quarterly report on Form 10-Q with the

SEC for the first quarter ended March 31, 2006. The Form 10-Q was signed by defendant

Lundquist and included statements concerning its financial results. The Form 10-Q also

contained certifications signed by defendants Falcone and Lundquist pursuant to §§ 302 and 906

of the Sarbanes-Oxley Act of 2002.

63.     In addition, MuniMae represented in the Form 10-Q, in relevant part, the

following:

> **Tax-exempt bonds, taxable bonds, interests in bond
> securitizations and loans**
> Bonds are accounted for as available-for-sale debt securities and
> are carried at their estimated fair values. Unrealized gains and
> losses are recorded as a component of other comprehensive income
> and realized gains and losses and other-than-temporary
> impairments are recorded in net income. The fair values of most
> bonds and interests in bond securitizations are based on quotes
> from brokers or other external sources. We determine the fair
> values of bonds that participate in the net cash flows or the net
> capital appreciation of the underlying collateral property and/or
> that are wholly collateral dependent and for which a limited market
> exists, based on discounted cash flow analyses using appropriate
> discount and capitalization rates. If the fair value of an available-
> for-sale security is less than its amortized cost and events and
> circumstances indicate the decline in value is other-than-
> temporary, an impairment loss is recognized.
>
> Loans receivable are carried at amortized cost net of valuation
> allowances. When we believe it is probable that we will not collect
> all amounts due under the terms of the loan, we record a valuation
> allowance. Loans held for sale are carried at the lower of cost or
> market and are typically held for less than three months.
>
> Interest income on bonds and loans receivable is recognized using
> a constant effective yield over the contractual term of each
> investment. Purchased premiums and discounts, fees and direct
> loan origination costs are included in the determination of the
> effective yield of each investment. We recognize participating
> interest income when received on bonds with participation
> features. We place investments on nonaccrual status when

40

> collection of interest is in doubt, which is usually after 90 days of
> non-payment. Interest payments subsequently received are applied
> first to accrued interest until such balance is zero. Investments
> return to accrual status only after all past due interest has been
> received, and there is no concern related to the collectibility of all
> principal and interest.

64.     The representations contained in ¶¶ 59-63 were materially false and misleading because MuniMae had not actually corrected its accounting errors, and for the reasons set forth in ¶ 58, above.

65.     On September 13, 2006, the defendants caused MuniMae to issue a press release and file a Form 8-K with the SEC that "certain previously filed financial statements for the fiscal years" ended 2003 through 2005, and "the quarterly periods within those years, and the first quarterly period in the fiscal year ended December 31, 2006," should be restated to correct certain errors. Specifically, MuniMae stated that the errors were related to the following areas: "accounting for syndication fees, accounting for equity commitments related to affordable housing projects and the classification of cash received from investors in guaranteed tax credit equity funds."

66.     The representations contained in ¶ 65 were materially false and misleading for the reason set forth in ¶ 58, above.

67.     On October 26, 2006, MuniMae announced the dismissal of PricewaterhouseCoopers LLP ("PwC") and the appointment of KPMG LLP ("KPMG") as its independent registered public accounting firm.

68.     On January 31, 2007, the defendants caused MuniMae to issue a press release entitled, " MuniMae Announces 40th Consecutive Increase in Quarterly Distribution." The press release stated, in relevant part:

> Municipal Mortgage & Equity, LLC announced today that its Board of Directors declared a distribution of $0.5125 per common share payable on February 20, 2007 to shareholders of record as of February 7, 2007. This represents a 4% increase over the distribution for the comparable period last year. On an annualized basis, the distribution equates to $2.05 per common share and represents a 6.5% yield based on the January 30, 2007 closing price of $31.44 per share. Because a portion of income allocated to shareholders may qualify for exemption from Federal income taxes, the stated yield does not reflect potentially higher net returns investors may realize as compared with other investments.

> MuniMae also provided a review of the Company's business performance for the year ended December 31, 2006 as well as that of its significant operating subsidiaries and certain other activities. Michael L. Falcone, Chief Executive Officer, stated, "The past year was a good one for MuniMae. We are pleased with our production volume during the year, particularly commercial real estate financings." Mr. Falcone continued, "We are very pleased with the value created for shareholders in 2006 - generating a total return of better than 30%. However, this good news is mitigated by our inability to file our consolidated financial statements in a timely manner. We remain strongly committed to completing our restatement efforts and are working hard to do so." The 2006 total return is based on cash distributions paid to shareholders and share price appreciation during the year. The restatement effort is not expected to impact the Company's cash flow. The information in this release is based on preliminary results and is subject to change as the Company completes its closing process and its independent registered public accounting firm completes its audit of the Company's consolidated financial statements.

69.     On February 9, 2007, the defendants caused MuniMae to issue a press release

announcing that it knew "of no reason why the recent trading of the stock has resulted in a

decrease in price." Specifically, the press release stated, in relevant part:

> Management of the Company is aware of recent developments in the sub-prime mortgage lending markets; however, to clarify, the Company is not engaged in sub-prime or any other single family mortgage lending activities. In fact, the debt and equity financings arranged by the Company in the housing sector are for multi-family rental properties. The Company's outlook for the multi-family rental sector is positive.

70.     As a result, the market price of MuniMae shares fell $2.56, or more than 8% than

the prior trading day's closing, and closed at $26.61 on February 9, 2007.

71.     On May 4, 2007, the defendants caused MuniMae to issue a press release entitled,

"MuniMae Announces 41st Consecutive Increase In Quarterly Distribution." The press release

stated, in relevant part:

> The Company also announced updated information on its ongoing
> efforts to complete the restatement of its previously filed
> consolidated financial statements as well as its 2006 consolidated
> financial statements. The Company has prioritized its restatement
> efforts by initially focusing its efforts on completing the audited
> financial statements of two key subsidiaries, MuniMae TE Bond
> Subsidiary, LLC ("TE Bond Sub") and MMA Mortgage
> Investment Corporation ("MMIC"). Completing these subsidiary
> level financial statements facilitates the Company's access to
> sources of capital and its ability to continue to originate mortgage
> loans that are ultimately sold to government-sponsored enterprises,
> such as the Federal National Mortgage Association ("Fannie Mae")
> and the Federal Home Loan Mortgage Corporation ("Freddie
> Mac"). The Company currently expects that the audited financial
> statements of TE Bond Sub and MMIC will be completed during
> the second quarter of 2007.
>
> As a result of prioritizing the completion of these subsidiary level
> audited financial statements, the need to consolidate the majority
> of the low income housing tax credit equity funds in which it holds
> interests, and its ongoing restatement efforts, the Company
> currently expects to file its 2006 annual report on Form 10-K on or
> before November 30, 2007. As the Company's restatement effort
> has progressed, additional material weaknesses in its controls over
> financial reporting have been identified. Consistent with previously
> identified matters, the Company is developing and implementing
> remediation plans to address these weaknesses. The Company has
> met with all its lenders to update them on its progress and current
> expectations. Further, the Company has obtained waivers from all
> its lenders which provide for an extension for submitting the 2006
> Form 10-K by November 30, 2007, and it is currently in
> compliance with all of its debt covenants.

72.     On July 10, 2007, the defendants caused MuniMae to issue a press release entitled

"MuniMae Announces Organizational Changes." The press release stated, in relevant part:

As previously disclosed, the Company has focused its efforts on completing the audited financial statements of TE Bond Sub and another of its subsidiaries, MMA Mortgage Investment Corporation ("MMIC"), as it simultaneously continues its efforts to complete the restatement of its financial statements and finalize its 2006 annual report. Mr. Falcone stated, "Completing the TE Bond Sub audit is a very important step along the road toward the completion of our restatement efforts and the filing of our 2006 annual report. As a result of non-cash restatement adjustments, shareholders' equity in TE Bond Sub (whose common stock is 100% owned by the Company) as of December 31, 2005 was approximately $52.9 million higher than the $272.5 million previously reported and net income for TE Bond Sub for the year then ended was approximately $11.9 million lower than the $37.5 million previously reported."

These restatement adjustments consist largely of corrections for errors related to the Company's estimation of the fair value of bonds (which increased shareholders' equity in TE Bond Sub by approximately $66.9 million as of December 31, 2005) and the Company's assessment of bond impairments (which decreased shareholders' equity in TE Bond Sub by approximately $14.1 million as of December 31, 2005), for the net increase of $52.9 million mentioned above, including certain other adjustments. The effects of these restatement adjustments are not necessarily indicative of the effects of other restatement adjustments that may be required in the Company's financial statements.

Certain other subsidiary level audited financial statements, specifically some of those for funds the Company manages on behalf of others, have also been completed and provided to the appropriate investors.

The Company is continuing to work towards completing the audited financial statements of MMIC and has obtained extensions through August 31, 2007 from the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), each of which require audited MMIC financial statements. In addition, the Company has obtained waivers through August 31, 2007 from those of its lenders that require delivery of audited financial statements for MMIC, and it is currently in compliance with all of its debt covenants.

73.     The representations contained in ¶¶ 68-69, 71-72 were materially false and misleading when issued for the reasons set forth in ¶¶ 31 and 58, above.

44

74.    On December 13, 2007, the defendants caused MuniMae to announce that it was

"not aware of any pending transaction or event that might give rise to the recent volatility in

MuniMae's stock price. In addition, management wants to reiterate that MuniMae is not engaged

in sub-prime or any other single family mortgage lending activities."

75.    The representations contained in ¶ 74 were materially false and misleading

because defendants knew that MuniMae would soon be forced to slash its dividend, and knew

that operating results were so poor that even the reduced dividend could not be funded from

operations alone, pending events that would be critical to investors.

**The Truth Begins to Emerge**

76.    On January 28, 2008 after the market closed, MuniMae issued a press release

entitled, "MuniMae Announces Quarterly Dividend." The press release stated, in relevant part:

> Municipal Mortgage & Equity, LLC announced today that its
> Board of Directors has declared a dividend distribution of $0.33
> per common share payable on February 15, 2008 to shareholders
> of record as of February 5, 2008. The Company also announced
> that while it expects to have completed by the end of February, its
> substantive work required to prepare its 2006 financial statements
> and its restated audited financial statements for 2005 and 2004, the
> Company does not expect to be able to file its audited financial
> statements by its previously announced goal of March 3, 2008.
> Based on work done to date, the Company does not believe the
> results of the restatement will materially change the previously
> recorded cash balances of the Company and its subsidiaries.
>
> **The reduction in the dividend distribution from $0.5250 to
> $0.33 per share is due to the cost of the Company's ongoing
> restatement of its financial statements, the decision by the
> Company to conserve capital to protect the long-term
> prospects of the business given the current volatility in the
> credit and capital markets, and the desire to dedicate
> additional capital to the high-growth Renewable Energy
> Finance business, an increasingly important part of the
> Company's business. A portion of this dividend will be paid
> from sources other than cash generated from operations.** The
> Board of Directors will continue to review the Company's
> dividend payout on a quarterly basis based, among other factors,

on the Company's net cash generation and the strategic needs of the business.

***

**The ultimate impact of the restatement is dependent on management finalizing all areas of the restatement and the completion of the external audit. Although the Company continues to work to file its restated financial statements at the earliest possible time, the Company does not expect to meet the previously announced March 3, 2008, New York Stock Exchange ("NYSE") deadline for filing its 2006 Form 10-K. As a result, the Company expects that the NYSE will suspend trading shortly and commence delisting procedures.** Upon suspension of trading on the NYSE, the Company's shares will begin to trade on the over the counter market pending a possible appeal and a final determination on the delisting. If the Company is delisted from the NYSE, the Company will be able to apply for relisting on the NYSE when all its filings with the SEC are current.

The Company currently expects to complete its unaudited financial statements for 2006 and its unaudited restated financial statements for 2005 and 2004 no later than mid-March 2008, and to file its Annual Report on Form 10-K for the year ended December 31, 2006, by May 30, 2008. [Emphasis added.]

77.   On January 29, 2008, MuniMae filed a Form 8-K with the SEC providing further details on its pending restatement of its financial statements for the years ended 2004 and 2005 and disclosing additional "changes" to its accounting policies.  The Form 8-K stated, in relevant part:

The restatement has not been completed; however, we expect that the restatement will reflect the following changes to our accounting policies:

•   Inclusion in our consolidated financial statements of approximately 200 variable interest entities of which we are deemed the primary beneficiary even though we own only small minority equity interests. The impact of consolidating previously unconsolidated ventures results in a substantial increase in the total assets on our balance sheet, in which we have a minor ownership interest. The net income impact may be negatively affected by (i) inclusion of our share of losses of the consolidated entities, to the extent such losses are in excess of our general partner investments

46

in those entities and (ii) inclusion of any amount by which the limited partners' shares of losses of consolidated entities exceeds their equity in those entities.

• Changes in the way we recognize revenue for our low income housing tax credit business, the largest impact of which is the deferral of revenue (syndication fees and asset management fees) related to guaranteed funds. In addition, the consolidation of these entities results in our eliminating asset management and guarantee fees, which we previously had recognized as a separate revenue item, and reflecting them instead as a component of the net income that results from the consolidation of these funds.

• Changes in the way we account for loans, including the fair value of our held-for-sale loans we used in determining the lower of cost or market value of these loans, changes in the way we determine which held-for-investment loans are impaired and the amount of the impairment, and changes in the recognition of loan origination costs.

• Changes with respect to our accounting for derivatives, including recognizing additional types of contracts as derivatives that must be marked to market, and other changes that affect the timing of profit and loss recognition.

• Recognition of additional guarantee obligations as liabilities and changing the way some recourse obligations are amortized to income.

• Changes to the estimated fair values of some of our bonds, derivatives, mortgage servicing rights and guarantee obligations, including increasing the value of some servicing rights we obtained through acquisitions or retained when loans were sold, which reduces the future income we will recognize with regard to those servicing rights.

• Other changes in accounting relating to bonds, mortgage servicing rights, equity investments, equipment, leases, including changes to the amortization and depreciation with regard to certain assets. In addition, we corrected our purchase accounting on some acquisitions, determination of our share of earnings and losses on investments accounted for under the equity method, and manner and timing of recognition of expenses with regard to share based compensation awards (none of which involved option backdating).

78.    On the same date, during a conference call with analysts on a question about the

status of MuniMae's restatement, defendant Kay noted that "the biggest area that's creating the

most impact in timeframe to get this done is this implementation of FIN 46, which revolves all

around consolidation accounting." Further, defendant Kay stated the following:

> We have so many different investments, significant ones through
> the LIHTC funds as well as other activities within the business. We
> had to analyze probably over 200 entities to determine
> consolidation or not. And at the end of the day on the [LIHTC]
> side we're consolidating these entities so that's – and we had no
> process really to do that before. Okay, so you got to basically build
> a process and implement it and do it for – we are doing it really for
> three years which include 10 periods and a lot of this has to go
> back to look at the accounting before '03 in order to get the
> beginning balances right.

> So that's just one example where there is a significant amount of
> work. The others were consolidating properties that we reassigned
> to GP interest. Again, we had no process to take care of that. So
> that's a highly manual intensive rework to get that done and you
> know as we go forward we'll automate that, but the fact of the
> matter is to go through the complexity of the accounting and get
> that cleared with our external auditor. Then to go through and do
> the re-measurement, it takes a significant amount of time and quite
> frankly we're, we did change auditors over a year ago. They are
> looking through the three-year period and a substantial amount of
> the work is to prepare audit packages for them to basically get
> through the audit. So everything is being examined by them. There
> is no reliance, if you will, on the previous auditor's work.

79.    In response to these disclosures, the price of MuniMae shares fell $8.01, or over

46%, and closed at $9.19 per share on January 29, 2008, on extraordinarily high trading volume

of nearly 3.8 million shares.

80.    On January 30, 2008, MuniMae disclosed in a press release that effective

February 6, 2008, its common shares would be delisted from the NYSE and would begin trading

over-the-counter on the Pink Sheets because MuniMae failed to meet "the NYSE's March 3,

2008 deadline to file audited financial statements for the 2006 fiscal year."

81.    In addition, MuniMae filed a Form 8-K with the SEC on January 30, 2008 in

48

which it disclosed pursuant to Regulation FD Disclosure further inquiries from investors and its

responses to them. In particular, responding to a question concerning the restatement process

and why it was "taking so long and costing so much," MuniMae disclosed the following:

> The biggest single contributor to the time and cost of the
> restatement results from a need to review hundreds of partnerships
> in which we hold small general partner interests to determine
> whether under FASB Financial Interpretation No. 46, we must
> include the accounts of those partnerships in our consolidated
> financial statements. We determined that more than 200
> partnerships, the assets of which consist primarily of limited
> partner interests in more than 2,000 other partnerships, had to be
> included in our consolidated financial statements. The inclusion of
> those partnerships essentially has to be done manually from the
> financial records of the partnerships, because we do not currently
> have systems to do this automatically. Also, because we are
> consolidating those partnerships, their assets, liabilities and
> operating results, including the amounts of their interests in the
> earnings and losses of the more than 2,000 partnerships of which
> the consolidated partnerships are limited partners, have to be
> reviewed and subject to audit procedures to be sure they are GAAP
> compliant.
>
> The restatement has effectively touched every aspect of our
> operations, and because we appointed a new independent auditing
> firm in 2006, we have had, and still have, a substantial amount of
> work to do to prepare audit packages and other materials related to
> their audit for the three years ended December 31, 2006, including
> their review of quarterly results for 2005 and 2006.
>
> Our restatement also has involved complex accounting issues
> relating to the timing of recognition of income from various
> sources, and a number of other matters, which are more fully
> described in our Form 8-K filed on January 29, 2008.

82. Consequently, the market price of MuniMae shares fell an additional $2.06, or

22%, on January 30, 2008, to close at $7.13.

## CLASS ACTION ALLEGATIONS

83. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil

Procedure 23(a) and 23(b)(3) on behalf of a class of all persons who purchased MuniMae

common stock during the period from May 3, 2004 through January 28, 2008, inclusive (the "Class Period").

84.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at the present time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members of the Class located throughout the United States. Throughout the Class Period, approximately 38 million shares of MuniMae common stock were outstanding, which were actively traded on the NYSE in an efficient market.

85.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have sustained damages because of defendants' unlawful activities alleged herein. Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously. The interests of the Class will be fairly and adequately protected by plaintiff. Plaintiff has no interests that are contrary to or in conflict with those of the Class that plaintiff seeks to represent.

86.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

87.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

        (b)     whether defendants misstated and/or omitted to state material facts in their

50

public statements and filings with the SEC;

(c) whether defendants participated directly or indirectly in the course of conduct complained of herein; and

(d) whether the members of the Class have sustained damages, and the proper measure of such damages.

88. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of MuniMae's common stock and operated as a fraud or deceit on purchasers of MuniMae shares during the Class Period by misrepresenting its operating condition and future business prospects. Defendants achieved this by making positive statements about MuniMae's financial results while they knew or should have known that such financial results were false, as detailed herein. When defendants' prior misrepresentations became apparent to the market, the price of MuniMae common stock fell precipitously as the prior artificial inflation came out of MuniMae common stock price. As a result of their purchases of MuniMae common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, i.e., damages under the federal securities laws.

89. At all relevant times, the market for MuniMae common stock was traded in an efficient market for the following reasons, among others:

(a) MuniMae 's common stock met the requirements for public listing and was listed and actively traded on the NYSE, a highly efficient market;

(b) As a regulated issuer, MuniMae filed periodic public reports with the SEC; and

(c) MuniMae regularly issued press releases that were carried by national

51

news wires. Each of these releases was publicly available and entered the public marketplace.

90. As a result, the market for MuniMae's securities promptly digested current information with respect to MuniMae from all publicly available sources and reflected such information in the price of its securities. Under these circumstances, all purchasers of MuniMae's common stock during the Class Period suffered similar injury through their purchase of that common stock at artificially inflated prices, and a presumption of reliance applies.

91. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as occurred, without the knowledge and complicity of the personnel at the highest level of MuniMae, including the Individual Defendants.

## FIRST CLAIM FOR RELIEF

### For Violation Of Section 10(b) Of The 1934 Act
### And Rule 10b-5 Against All Defendants

92. Plaintiff repeats and realleges each allegation above.

93. Each of the defendants, while each held the positions described above: (a) knew or recklessly disregarded material adverse nonpublic information about MuniMae's financial results and then-existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports, and other public representations of and about MuniMae.

94. During the Class Period, defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order

52

to make the statements made, in light of the circumstances under which they were made, not misleading.

95.    Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of MuniMae securities during the Class Period.

96.    Plaintiff and the Class, in reliance on the integrity of the market, paid artificially inflated prices for MuniMae common stock. Plaintiff and the Class would not have purchased MuniMae common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' false and misleading statements. Upon disclosure of the misrepresentations and omissions referenced above, the price of MuniMae common stock fell, which caused the losses by which plaintiff and the Class have been damaged.

## SECOND CLAIM FOR RELIEF

### For Violation Of Section 20(a) Of The 1934 Act
### Against The Individual Defendants

97.    Plaintiff repeats and realleges each and every allegation above.

98.    While each held the positions described above, the Individual Defendants acted as controlling persons of MuniMae within the meaning of § 20(a) of the Exchange Act.

99.    Accordingly, each Individual Defendant is liable to plaintiff and the Class for MuniMae's violations of § 10(b) and Rule 10b-5.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and awarding such equitable/injunctive relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 4, 2008

POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS, LLP

By: _____
Marc I. Gross
Fei-Lu Qian
100 Park Avenue, 26th Floor
New York, New York 10017
Tel: (212) 661-1100
Fax: (212) 661-8665
migross@pomlaw.com

Patrick V. Dahlstrom
Joshua B. Silverman
**POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS, LLP**
One North LaSalle Street, Suite 2225
Chicago, IL 60602
Tel: (312) 377-1181
Fax: (312) 377-1184

Klari Neuwelt
**LAW OFFICE OF KLARI NEUWELT**
110 East 59th Street, 29th Floor
New York, NY 10022
Tel: (212) 593-8800
Fax: (212) 593-9131

*Attorneys for Plaintiff*

## CERTIFICATION

Naomi Raphael declares the following under penalty of perjury:

1.   I have reviewed the complaint in this action and authorize its filing.

2.   I did not purchase or acquire the security that is the subject of the complaint (shares of Municipal Mortgage & Equity LLC) at the direction of plaintiff's counsel or in order to participate in any private action for securities fraud.

3.   I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.   My transactions in Municipal Mortgage & Equity LLC securities during the class period specified in the complaint (May 3, 2004 through January 28, 2008) were as follows:

| Trade Date | Purchase(P)/Sale(S) | No. of Shares | Price per Share |
|---|---|---|---|
| 8/10/07 | P | 500 | $ 23.23 |
| 01/31/08 | S | 400 | $ 7.11 |
| 01/31/08 | S | 100 | $ 7.1101 |

5.   I have not sought to serve as a representative in any class or other representative actions filed under the federal securities laws during the last three-year period, except that I filed a class action complaint in the litigation that was later

1

consolidated as <u>In re Delphi Corp. Securities Litigation</u>, MDL No. 1725.

6. I will not accept any payment for serving as a representative party on behalf of a class other than my pro rata share of any recovery, except as ordered or approved by the Court.

Dated: February ___23___ , 2008

_Naomi Raphael_
Naomi Raphael

2